Good morning. My name is Lisa Crigston, and I represent DNRB, a small steel construction company based here in St. Louis. DNRB was convicted in a criminal case in the Western District of Missouri for a violation of 29 U.S.C. 666E. The violation that DNRB was convicted for is a violation that Congress did not intend to create and actually did not create. At issue here are three points, three uncontroverted points. Number one, the government's charge against DNRB was for a violation of an OSHA standard that required the existence of personal fall arrest systems. Number two, it is uncontroverted in the evidence that's in the record that the relevant steel worker, Mr. Roach, was wearing an OSHA-compliant personal fall arrest system at the time that he fell and died. And number three, as shown in its order, the district court found facts that demonstrate Mr. Roach was wearing a personal fall arrest system as required by the regulations and yet still found DNRB guilty. The basis for Roach and ensure continuous use of the personal safety equipment. The heartland issue, the heartland legal issue for both appellate issues one and two, as presented in this case, is whether the regulations that were charged actually require supervision by an employer. The language that the regulation uses is, shall be protected from a fall, right? That's exactly right, Your Honor. So isn't it reasonable to find a violation where the evidence shows that despite the fact they have it, the management knows that the fall equipment isn't being used? Are you protecting them if you know that it's not being used and don't take steps to discipline, fire, whatever it takes to get them to use it? Right. Your Honor, I think it's an excellent question and it goes to the heart of this issue because we have to read these regulations as a whole. In looking at the regulations, the ones that DNRB was charged with actually lay out the requirements for a personal fall arrest system. In another section of those regulations, it says that the employer shall be required to ensure their use. And in fact, the three cases that the government primarily relies on in defending its position all actually are interpreting that other section. So when we look at the Brock case, and when we look at the Otis Elevator case, and the Turner Construction case, all of which are cited by the government, and all of which deal with does the employer have an obligation to supervise, we see that the government, we see that in those cases the other standard was cited and the courts in those cases found that the standard had been met. So what has happened here is that there are some narrow standards that were created about what constitutes a personal fall arrest system. And that's what DNRB was charged with. And instead, what the district court has done is read in those supervisory standards from the other regulations. And I think that that is, I don't think, I believe, based on all the case law, all of the arguments presented by the government, this has never been done before. There is no interpretation of the standards at issue consistent with the government's position here. You don't think shall protect sort of implies a supervisory duty? I do not. I think that the shall protect language, as it is written, then leads into a description of the types of equipment that could protect someone. And so the shall protect language has to be read in connection with what follows. And what follows is descriptions of the type of equipment that would qualify. The shall protect language does not read in and has never been interpreted in any court in the country as requiring supervision. The effect of what has happened because of these, the misuse of these standards is that the mixing of these regulations, both the government and the way they approach the case and the district court, and in the district court's opinion, is that it's no longer clear what DNRB has been found guilty of. When you look at the elements that DNRB was charged with, when you look at the regulations listed in the information, those regulations, as I've stated already, require that there is safety equipment present. In this case, it's uncontroverted that safety equipment was present. What is perplexing, and one of the reasons for this appeal, is that the district court then goes on to hold that had there been safety equipment present, Mr. Roach would have used that equipment. And that is contrary to any of the, we believe, the facts of the case, but more importantly, that is not the standard that is at issue in this criminal case. The government could have charged DNRB with a failure to supervise, and then the playing field or the heartland of the trial would have been clear. But here, what has happened, and the reason for our issue number two, which is the constructive amendment, is that DNRB walked into this court case believing that it had been charged with the failure to have personal fall arrest systems or other safety equipment available. And the government proved, and the court accepted as proof, and then found guilty, that there was a failure to supervise. And we know this. Well, wasn't there also an issue about whether or not your client had provided, I think they are called chokers, the device, you have to have the, wear the vest, if you want to call it that, the safety device. But then you also have to have something to attach it to, and you have to have the lanyards and the chokers to make those attachments. So wasn't there a serious question about whether your client provided those? There were some questions about how many chokers were present. There is no dispute. Well, there's no question, but they didn't provide them, right? That is correct. So, they didn't provide any chokers, as I understand, to tie off. Let me back up and clarify my recollection of the record, Your Honor. There were chokers on the site that my client, DNRB, provided. The choker that Mr. Roach had in his possession at the time of his fall may have been, based on the evidence, a choker that he personally brought to the work site. And a worker bringing property to the work site is allowed under the OSHA regulations specifically. So the steel erection workers who testify, testify that they prefer their own vests, their own lanyards, and they often provide chokers. But separately from that, Your Honor, I think it's important to realize that that is a second type of safety equipment that was present. The record is very clear, and it is uncontroverted, that my client provided lifts, and that all of the work done by Mr. Roach and his partner on that work site could have been done in those lifts. So there was testimony from steel workers that not only were the lifts there, not only could work have been done, but from the time of this fall forward, until the building was completed, every one of these local ten workers actually performed those exact activities from the lifts. We also introduced a video into evidence, Defendant's Exhibit 513 A and B, I believe, demonstrating to the court that every piece of the job could have been done from the lift, which would have eliminated the necessity of a choker altogether. Well, but you have a factual finding by the District Court that says that Fast Track did not provide the necessary safety equipment. They did not provide chokers. They were asked for chokers. They said they didn't have them. Now, you may disagree with that, but is that we have to take that as a corollary erroneous finding against, you know, we always take it in the light most favorable to the government in criminal cases, that they specifically complained about it. They didn't provide it. Any personal, any fall protection was their own personal harnesses. Are you, don't we have to accept that as a factual finding? Your Honor, respectfully, I don't believe that that actually is what should have been the factual finding based on uncontroverted evidence in the courtroom. There was evidence that DNRB did provide some safety equipment. In addition, there was testimony, as you referenced, that some workers on the very first day asked about some, whether there was safety equipment present. And that conversation happened on the first day before any of the steel had been erected. From that day forward, there is evidence that there were chokers provided by my client on the site. There were yo-yos on the site. There were other pieces of safety equipment, including these lifts on the site. So I think it is erroneous, Your Honor, from the government's own evidence. Now, it is true that there were other pieces of equipment that weren't provided. They talk about other types of safety equipment such as static lines or stanchions, things like that. Those things weren't provided. And they weren't required to be provided. DNRB had a safety plan and a work plan as to how this work was going to be done. And those types of pieces of equipment weren't part of that plan. And so the absence of that equipment is not an absence of safety equipment on the site. The issue about the safety equipment really highlights one of the core issues and is what issue two on appeal is about, which is the constructive amendment of this information. Because what the district court did is looked beyond the work site and the work area that Mr. Roach was in and surveyed the entire landscape of this work site. As this court may know based on the record, there were two separate work areas with two separate work teams, wholly different processes, wholly different responsibilities, and importantly, completely different supervisors. And what the district court did is mesh those together and say, because work site two, which Mr. Roach was not on, may have been lacking some safety equipment, I find that there is a generalized safety issue here. And therefore, I find DNRB guilty. The problem with that is it goes back to Congress' intent and the actual words of this statute. The actual requirement in this statute, and the reason there have only been, I believe, somewhere around 20 criminal cases in all 50 years of this statute, is because the requirement for a criminal violation as opposed to a civil violation is very specific. It is that the government has to prove that the actual violation was done willfully. And what the district court did, instead of looking at the actual violations that the government chose to charge and deciding whether that activity was willful, what the district court did is he surveyed the entire landscape of this enormous work area and looked at this second team. And when you read the court's opinion, you will see that there are numerous references to someone called Mr. Goss had nothing to do with the issue that was actually charged. At best, whatever happened with Mr. Goss and his team perhaps would have been 404B evidence, although it was not noticed up. But it had nothing to do with the specific violation that was charged. And so what we have observed and what we fear is that this court has seen in the district court and what we fear is that looking at the generalized workplace, finding willfulness somewhere within the generalized workplace, and then finding DNRB guilty of the specific violation that the government charged is inappropriate. And that if that is allowed to continue, it will actually change the way this law is enforced throughout the country. Because then generalized willfulness somewhere within the workplace can be enough and there doesn't have to be a specific charge. At this time, Your Honor, I would like to reserve the remainder of my time. Thank you. Very well. Thank you. Good morning. May it please the court. My name is Rachel Parsons. I'm a senior trial attorney with the U.S. Department of Labor. I'm also a special United States assistant for this case. And I'm here on behalf of the United States government. My co-counsel is Mr. Paul Becker, an assistant United States attorney from the Western District of Missouri. I would like to correct a couple of misstatements by DNRB. DNRB was not convicted of a generalized failure to provide a safe workplace. They were convicted of violating two very specific standards requiring fall protection equipment. The standards don't say provide equipment. The standards say shall be protected in accordance with paragraph A of this section from fall hazards. Section A also says shall be protected from fall hazards and lists the means by which the employees can be protected. Counsel also mentioned that she said this has never been decided in this manner. I think that is incorrect. This court has previously decided Dakota Underground. In the Dakota Underground case, it's very similar. The standard in Dakota Underground was a trenching standard, but required that employees in an excavation shall be protected from cave-ins. In that case, the equipment was present on site. There were trench boxes. There were ladders. The foreman failed to In fact, one of the trench boxes was in the trench. The employee, Mr. Moran, worked outside of the trench box. He also had no access to the ladder because the ladder was up on the side of the trench. This court in that case found that Dakota Underground was responsible for the actions. Dakota Underground attempted to blame the employees saying they didn't use the equipment we gave them. In the Dakota Underground case, the court was very clear that Dakota Underground had the duty to enforce the use of the equipment. It's not enough to merely have it under a shall be protected standard. Counsel, would you agree that even if we were to accept counsel's argument that the language of the regulation does not have a supervision requirement, that there is a difference between Yes, there is. In this case, there was supervision. Mr. Wykens was standing on the ground watching Mr. Oden and Mr. Roach work. Mr. Oden specifically testified, and the Judge Kayes found it particularly credible when asked where Mr. Wykens was, where we were walking on the steel, landing these steel bundles of decking. He said he was underneath us watching. When asked what enforced the use of fall protection, it wasn't provided. We would dispute that Mr. Roach had all the equipment necessary. Mr. Roach and Mr. Oden were the two connectors working above 36 feet on these steel beams that are 9 inches and 5 inches wide. They did have a harness and lanyard that they brought. They each had one choker, which they also brought. The misconception is you can't tie a choker off anywhere. You must tie it off to a secure location. In this case, that would be the trusses. The joists were not fully secured. Additionally, there are webbing or cross bracing that doesn't allow you to move. When you wrap the choker around the beam, then you're limited by how far you can go by the cross bracing. The employees who testified, testified that was approximately 4 to 6 feet. These bundles of decking were 26 feet long, 3 feet wide, and weighed almost 15 to 2,000 pounds. The employees were guiding them onto the steel joists. Additionally, it's not compliant with OSHA to tie off to the webbing of a joist. Those are the smaller cross beams. The standard requires that they be able to withstand 5,000 pounds vertical load, which was a finding Judge Kaye's made as well. So, if he had a harness and a choker, what equipment wasn't provided? These gentlemen were required to land the decking. They had to move along the beam. But isn't that more of an argument of how the individual workers were doing their job as opposed to what equipment wasn't provided for them? There would be times when they would be, even if they used the choker and constantly connected and reconnected, there would still be a number of times when they were not protected from fall equipment. There's no way to move along the beam with a choker. It's not possible. So what should they have provided? There are a number of options they can provide. One of them, which an iron worker testified was used on a similar project across the street is called a static line. There are stanchions or connections made at each end of the beam. A heavy cable is attached to each of those. And then the iron worker merely clips the lanyard on. He can move all the way along the beam. He can move in different directions. It's a lot more flexibility. There's another piece of equipment called a beamer, which is kind of a metal clamp. It's clamped onto the top of the truss. When pressure is applied, such as a fall pressure, or if they move too quickly, I suppose, that beamer clamps to the truss and doesn't allow any further movement and would not allow them to fall. Ms. Crickston made a significant reference to the fact that there were lifts. The employees testified these lifts were not the appropriate means for the job. They testified that the video that was shown in court by DNRB was not similar to the work they were doing. In that case, in the video, there was a different lift. There was a different number of sheets of this decking. There was only one sheet of decking, as opposed to 15,000 pounds of decking. By other employees using the lifts to work on the bottom of the steel, they insert these cross members called bridging to support the strength of the structure, that they had to place wooden boards through the cross rails to be able to reach. It stands to reason that these gentlemen couldn't have been up above the steel if the other gentleman couldn't properly reach the steel underneath. Well, what did the, what did the, was it Mr. Odom, was he the one who was? Yes, Mr. Odom was on there. So what did he testify as to why they had to get off the lift? He said that because the nature of swinging the bundles in, they often came in turned or not in the proper location. There's a standard, an OSHA standard and an industry standard that they have to be placed carefully so that the weight of the bundle is properly supported along the entire length, so that if someone else should step on it, they won't fall through, it won't tip over. He said to do that, he had to be on one end and Mr. Roach had to be on the other end of the, excuse me, the bundle. How long were they again? They're 26 feet long. Judge Quirk, and the information was very specific in charging 1926, 760A1 and B1. There was no generalized charge. There was no charge under Section 5A1 of the Act, which is when there's no specific standard. This was a specific standard that required specific action. There's a recent case that we forwarded with a 28J letter, Martin Mechanical, which is a similar case to this. The courts applied the same willful standard. It is a civil case. It came down March 27th of this year. In that case, the OSHA standard required employees on walking, working surfaces shall be protected from falling through holes, including skylights, more than six feet above lower levels by a personal fall arrest system, covers or guard rails. In that case, the foreman merely told the employees to be safe. Even though they had equipment to, personal fall arrest equipment, they didn't use it. And the court found that it was the duty of the employer to enforce the protection. Additionally, the court in Brock v. L.E. Myers found that Congress specifically imposed the responsibility to assure compliance with OSHA standards on the employer, stating the statutory duty to assure compliance with the standards issued under the Act includes the obligation to prevent non-hazardous, non-compliant conduct by the employees. In this case, the employees didn't have adequate anchorage. They did have a harness. They did have lanyards, but they even if they had the equipment, DNRB made no efforts to enforce the use of that equipment. They made no efforts to make sure that all of the employees were protected from fall hazards. In fact, they not only consciously disregarded these standards, they disregarded other fall protection standards on this worksite. They were plainly indifferent to the employee's safety. Ms. Crickson described this as two separate worksites. This was one large open-air warehouse. The warehouse was 300,000 feet long in square footage. However, they were working on the first sections. You could look up and see virtually every part of the worksite. The employees testified they could see each other. When they weren't performing their own work, they could look up and see other employees. DNRB's failure to protect its employees from fall hazards and specifically Mr. Roach caused his death. The judge tracked the case of United States v. Pitt-Des Moines in finding that had Mr. Roach had appropriate fall protection equipment and had it been available, he would have used it and not fallen to his death. For DNRB's failure to comply with the standards to make sure employees were protected from fall hazards and its indifference to fall safety and Eric Roach would not have died, he then found it was the legal cause, stating it was a foreseeable natural result that allowing an employee to work 36 feet above a concrete floor without fall protection could result in his death. He found that if he had had access to appropriate fall protection and been required to use it, he would have fallen no more than 6 feet. The district court found causation here with the death saying that had he been provided the equipment, he would have used it. Is that a reasonable assumption given that he wasn't using the equipment he had? I think it was because there was testimony by Mr. Oden that they asked at least twice on the first day for safety equipment to use in fall protection. There was testimony by six other iron workers that they searched for fall protection equipment. They asked various foremen for fall protection equipment. DNRB would like to separate out all of their foremen, one from another, but the testimony by their management official was that all the foremen were responsible for safety on the work site and were capable of responding to and providing equipment when asked and when necessary. In the Valdeck and Dakota Underground cases, willful was defined as an act done voluntarily with either an intentional disregard of or plain indifference to the act's requirement. In this case, there was a, to quote Judge Kaye's, a mountain of evidence documenting that DNRB, through its foreman, not only consciously disregarded the requirements of the OSHA standards, 760B1 and 760A1, there was evidence they were plainly indifferent to ensuring the safety of iron workers in general and specifically in protecting them from fall hazards. DNRB had previously been cited for 760A1. In their work plan that Ms. Crookston referenced, they stated they would do 100% tie-off. That's an industry standard that requires all employees to tie-off above 6 feet, not above 30 feet, but above 6 feet. They did not follow that. Additionally, DNRB's foremen were clearly in charge of safety. Their management officials and their safety manual, which was Exhibit 29, specifically addressed the responsibilities of the foremen. These foremen were well aware of OSHA's citations. They signed documents stating that. They were trained in OSHA fall protection. They were, in fact, trained on the requirements of having an anchorage capable of withstanding 5,000 feet of vertical pull, and that would be Exhibits 22 to 24. The company policy in their safety manual required the foremen to inspect the equipment used by their iron workers and to provide any necessary fall equipment. Mr. Weekins, the foreman in charge of Mr. Roach, admitted he did nothing to inspect the equipment. Judge Case stated he carefully reviewed all of the information, all of the evidence in his findings, and found that Mr. Weekins and Mr. Goss, the foreman for DNRB, and the representatives of ARCO were not persuasive or credible. However, he found DNRB chooses to ignore the testimony of the iron workers, which Judge Case found particularly credible. There was no constructive amendment of the information or any variance. The government carefully tracked through the information in offering its evidence. I would direct you to paragraphs 10, 11, and 12, which specifically set forth that DNRB failed to protect Eric Roach from fall hazards by failing to provide and enforce the use of fall protection equipment. As for the 404B evidence, the evidence of the prior citation was admitted as a business record that was also... I'm sorry. It's also... Notice was given July 15th, well before the trial. The subsequent violation, which by the way involved the exact same foreman, Mr. Weekins, who was the foreman supervising Eric Roach, there was a subsequent violation at the St. Louis worksite in May following the fall the previous July. Council was notified of those in the pretrial brief. Excuse me. All of the documents supporting the prior and subsequent violations were furnished in January 2016. In fact, council admitted at trial that they were not surprised by the evidence or by the documents. As to the alleged 404B evidence related to the multiple fall protection standards occurring at the same time, this was intrinsic to the willfulness of the company and their conscious disregard not only to Eric Roach, but to all the iron workers on the site. Finally, this was a court tried case. Judge Kays was well capable and did... There was no showing of actual prejudice. Judge Kays did not make any improper use of this evidence and is exhausted of findings of facts. District court judges are well able to separate any potential prejudicial issue from the probative value. Before you run out of time, I do want to ask you about one other matter. Yes. The pre-sentence report in this case indicated that the defendant had no ability to pay a fine, to which you did not object. I'm not sure I agree with your brief that the district court can then ignore that, but what about imposing a $500,000 fine without making any finding of an ability to pay a fine? Actually, I think Judge Kays did address... First off, this is a Class B misdemeanor and the sentencing guidelines do not apply to Class B misdemeanors. I understand. They don't apply. The standard is plainly unreasonable. It's a somewhat different standard than we normally apply to sentencing. Judge Kays did consider the factors in the financial condition under 3572. In fact, he made quite a record and referred to the subpoenaed information that showed that money was being dissolved to avoid responsibility. In this case, the company dissolved well after the information was filed. The evidence was that they had paid over $335,000 in legal fees after the dissolution of the company in January 2016. In fact, up through July 2017, DNRB was in the hands of attorneys. This money appeared to have been transferred among various corporate entities owned by Debbie and Clayton Bragg, who owned... Mr. Bragg owned DNRB. The money was then deposited in the personal bank account of Clayton and Debbie Bragg and then transferred to the DNRB account. That stands to reason if they can find the money to pay $355,000 in attorney's fees after they're dissolved, they can find some money to pay the $25,000 in quarterly installments. This doesn't seem to be a question of DNRB's financial condition, but it's more a question of their willingness to pay. Clearly, there's money injected into this corporation on a regular basis. If the court has no further questions, the government asks that the judgment be affirmed and the sentence of $500,000 be affirmed. Thanks to the court for this opportunity to present our case. Thank you, Ms. Parsons. Thank you. Let me begin with the sentencing issue, Judge Mollet, that you brought up. The court did not find that DNRB had any ability to pay. The idea that has just been suggested that everything about DNRB's business was transparent to the government throughout the investigation and the time leading up to the trial. In fact, we filed a notice of dissolution and had a conversation with the government well before the trial. What happened, and I believe this is in the sentencing record, is once these citations were issued, and they're civil citations that are not before the court right now, they're still pending. Once the citations were issued, the work dried up. We will stand by our briefing on the sentencing argument, except I do want to say this. As Judge Mollet has pointed out, there was no finding that DNRB had any money available to it. The idea that we can, in some way, pierce that corporation, go beyond that corporation, and somehow then look to businesses owned by the owner's wife, again, as we told the district court, we see no precedent for that, and that would be inappropriate. I do want to turn back for a couple moments to the arguments that were made by the government just now, because I've heard something that I've never heard before in this case. In response to one of Judge Mollet's questions, the government now says that the equipment that DNRB provided was inadequate, and that to be adequate, there should have been stanchion lines or beamers or those sorts of things. That has never been the government's argument prior to today, and I am concerned that it is now the argument to defend this, because the regulations are clear that the employer gets to provide the types of safety opportunities, the type of equipment that are to be available. Now, could there be types of equipment that would make the steel connectors work easier? Yes. And if that is the standard, then perhaps the government would be right. If the idea is we have to provide the most efficient or the easiest equipment for the worker to do their job, then that is a wholly different question, and we would have to explore that. That's not what the regulations provide. Here, the evidence supported the fact that the equipment provided, both the lanyard, the choker were there, the lifts were there, and contrary to what the government has said, the steel connectors who came to work on this very worksite the days after the accident occurred used those exact lifts to land the very same type of decking. It could be done, both as shown by our video and as demonstrated by the testimony of people who said that it was done by people on that worksite using that same type of equipment. The other thing that I want to bring up about the equipment is the government says that the anchorage point was insufficient. That was not a finding by the district court. There was some discussion of that in the record, but the district court did not find that the anchorage point itself did not have enough weight or could not have supported enough weight. The government has mentioned two cases, and I want to turn to those briefly. One is the Dakota Underground case, and I think that that case underscores DNRB's point here. Can I go back to what you just said? Yes. You said that that's just the first time this has ever come up. I was just looking at the government's brief. They specifically cite all three of those as possible and recite the trial transcript. I haven't read them. Yes. The trial transcript, but they mentioned the beamer. They mentioned the static line. They mentioned retractable as all options that could have been used. I'm not sure I understand when you say this is the first time it's ever been mentioned. Thank you, Your Honor. I appreciate the opportunity to clarify that. Those items had been mentioned at trial. It had never been mentioned prior to today that what had been provided is inappropriate. What the government did is provided other alternatives that the company could have given the workers, and there was testimony and it is in the record about that. There had never been a statement prior to today that the use of the lanyards and the choker was inappropriate, and that's what I have now today understood the government to say. The two cases brought up by the government, Dakota Underground, that case exemplifies exactly why it was inappropriate to find DNRB guilty. In that case, the court found that the equipment had not been provided. It was not accessible at the time the workers were working. Here, there were two types of fall protection accessible to the workers at the very moment that this incident occurred. Second, the Brock case. That case actually, again, was interpreting a standard that requires an employer to enforce the use of safety equipment. That case is inopposite from this one. Here, we were charged with the failure to have the safety equipment as required. In the Brock case, the company was charged with the regulation that required an employer to require the use of safety equipment. Those are inopposite and exemplifies why the government should have, perhaps, charged this case differently. I also want to reference for a moment that the employees could see one another in the conversations about the other worksite. As the government has pointed out, it was a very large worksite. There was testimony that, at times, employees from the second work area that had nothing to do with Mr. Roach could look over and see individuals on Mr. Roach's work area. What's important is, when you look at this trial, of the ten ironworkers who testified, only four had any direct knowledge of what happened with Mr. Roach. The other six testified about things completely separate from Mr. Roach. They may have asked for safety equipment. They may have had different safety needs. That had no bearing on what happened to Mr. Roach. Again, I think that this confluence of these two areas and the merging of everything that happened on that worksite demonstrates that the verdict was wrong and that there was a constructive amendment of the information. Thank you, Your Honors. Very well. The Court appreciates your arguments today and your briefing. The case will be submitted and decided as soon as we can.